**Fulton BATTISE, Chief of the Tribal Council of the Alabama Coushatta Tribes of Texas, et al.**

v.

**The UNITED STATES.**

No. 3–83.

United States Claims Court.

May 29, 1987.

Don B. Miller, Boulder, Colo., for plaintiff Alabama Coushatta Tribe of Texas. Jerilyn DeCoteau, Tom Diamond, and Alan Minter, of counsel.

David F. Shuey, Washington, D.C., for defendant.

HEARING OFFICER'S REPORT ON CLAIM OF ALABAMA COUSHATTA TRIBE OF TEXAS

WHITE, Senior Judge.

House Resolution 69, 98th Congress, 1st Session, referred H.R. 1232, 98th Congress, 1st Session, to the Chief Judge of the United States Claims Court, and directed him to "proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code."

H.R. 1232 is a bill which, if enacted, would authorize the payment of money out of the Treasury for the benefit of the enrolled members of the Alabama Coushatta Tribe of Texas [1] and the Coushatta Tribe of Louisiana, respectively, the money to be in full settlement of all claims of the tribes "arising from the taking by the United States of land owned or occupied by such tribes without payment for such lands of compensation agreed to by such tribes, and claims based upon fair and honorable deal-

ings that are not recognized by any existing rule of law or equity, and other claims which otherwise, except for the lapse of time and the failure to timely file, would have been compensable under the Indian Claims Commission Act, section 70 of Title 25 of the United States Code."

The Alabama Coushatta Tribe of Texas and the Coushatta Tribe of Louisiana filed separate complaints with the Chief Judge of the United States Claims Court. These two tribes are separate legal entities, their respective claims against the United States are different in nature, and they have been represented by different counsel in the proceedings under House Resolution 69. Consequently, for the most part, the proceedings under House Resolution 69 have been conducted by the Hearing Officer as though two separate Congressional Reference cases were involved.

The report of the Hearing Officer and the approving report of the Review Panel on the claim of the Coushatta Tribe of Louisiana have previously been submitted to the House of Representatives by the Chief Judge of the United States Claims Court.

The present report relates only to the claim of the Alabama Coushatta Tribe of Texas, which was the subject of a full-scale trial held in Austin, Texas, and in Washington, D.C.

*Nature of Texas Tribe's Claim*

In its complaint, the Alabama Coushatta Tribe of Texas (usually referred to hereafter as "the Texas Tribe") asserts that at the time when Texas entered the Union as a State on December 29, 1845 (9 Stat. 108 (1845)), the ancestors of the present members of the Texas Tribe held aboriginal title to the lands which comprise the present Texas counties of Angelina, Chambers, Hardin, Jasper, Jefferson, Liberty, Montgomery, Nacogdoches, Newton, Orange,

1. Although the resolution and the bill use the plural "Tribes" in connection with the Texas group of Indians, the Texas group has customarily used the singular "Tribe" in its complaint and other filings with the Chief Judge. Consequently, the singular "Tribe" will be used by the Hearing Officer in referring to the Texas group.

Polk, Sabine, San Augustine[2], San Jacinto, Trinity, Tyler, and Walker (usually referred to hereafter in the report as "the claim area"). The complaint further asserts that, after Texas entered the Union, and through the acts of third parties which the ancestors of the Texas Tribe did not authorize, the ancestors lost possession of virtually all the lands to which they allegedly held aboriginal title. It is further alleged in the complaint that the United States failed to protect the tribal ancestors in the possession of their aboriginal lands, and that this failure constituted a breach by the Federal Government of a fiduciary duty imposed on the United States by the Constitution, the Indian Nonintercourse Act, and the federal common law. The Texas Tribe seeks to recover damages from the defendant, including, but not limited to, the fair rental value of, and the profits from, the claim area for the entire period since the time of the dispossession.

### The Facts

The facts, as found by the Hearing Officer on the basis of the evidence in the record, are outlined in this part of the report.

The Alabama Coushatta Tribe of Texas is an incorporated Indian tribe, having been incorporated under the provisions of the Indian Reorganization Act of 1934 (25 U.S.C. § 477 (1982)). The tribe occupies a reservation of approximately 4,200 acres located in Polk County, Texas, near the town of Livingston. There are approximately 500 members of the Texas Tribe, the great majority of whom live on the reservation.

The members of the Texas Tribe are descended from two aboriginal American Indian tribes, the Alabama Indians and the Coushatta Indians. The first known contact by white men with these tribes was by the Spanish explorer, Hernando De Soto, and the members of his expedition, who visited the Alabamas and Coushattas during De Soto's exploration of the Mississippi River Basin in 1540–41. At that time, the

Alabama Tribe was located in the northern part of the present State of Mississippi, and the Coushatta Tribe was living on an island in the Tennessee River. By the end of the seventeenth century, however, both the Coushattas and the Alabamas were located in the vicinity of the confluence of the Coosa and Tallapoosa Rivers, within the present State of Alabama. These tribes had separate chiefs and languages (although their languages were mutually understandable), and they also had cultural differences. Nevertheless, the Coushattas and the Alabamas often intermarried, and they generally acted as one people.

As a result of the French and Indian War, in which British military forces defeated French forces, the British Government in 1763 gained sovereignty over all lands lying east of the Mississippi River (except for the City of New Orleans). The record reveals that the Alabamas and Coushattas were pro-French tribes; and, consequently, that most of them left Alabama in 1763 to avoid British authority, and began a migration westward toward the portion of the present State of Louisiana which was still under French authority. The migration was necessarily a slow process; but it is clear from the evidence in the record that, before the end of the eighteenth century, the Coushattas and the Alabamas were established in the western portion of the present State of Louisiana, principally between the 30th and 31st Parallels of North Latitude, and between the Achafalaya and the Sabine Rivers.

The evidence in the record does not permit a finding as to exactly when Alabamas and Coushattas began to move into the claim area. It is clear, however, that at least by the year 1800 a slow migration of Alabamas and Coushattas into the present State of Texas, which was then Spanish territory, and into the claim area had begun. At that time, the claim area was mostly covered by forests, but there was some open grasslands, and the area abounded in many kinds of wild game. The soil was fertile; and, except for an

2. The complaint refers to "San Austin" as a county within the claim area, but the Texas

Tribe's maps and other evidence refer to this area as San Augustine County.

area that came to be known as the Big Thicket, the claim area was suitable for farming when cleared. The Big Thicket was a huge forest located in parts of the present Texas counties of Polk and Hardin. It had very tall pine, oak, magnolia, and numerous other species of trees; and beneath the trees were all sorts of undergrowth, including privy, holly, and bay, as well as cane brakes 20 feet high. The undergrowth was so thick that one could walk for miles without being able to see more than 20 yards ahead. In fact, this forest was so dense as to be virtually impenetrable. Nevertheless, it was rich in wildlife, including an abundance of deer, bears, beavers, 'possums, skunks, raccoons, squirrels, turtles, fish, waterfowl, and many varieties of birds.

International politics hastened the movement of Alabamas and Coushattas into Texas and into the claim area. In 1803, as a result of the Louisiana Purchase, the United States acquired from France all of Louisiana still held by the French, as well as other vast areas. At that time, Spain had a total military force of only about 300 men in Texas, and was concerned about possible incursions from the United States into the region. Consequently, Spain encouraged friendly tribes, such as the Alabamas and Coushattas, to settle along the Texas side of the Texas-Louisiana border, to serve as a buffer against possible American aggression. The evidence shows that this policy was successful in encouraging Alabamas and Coushattas to settle in Texas. By the end of the first decade of the nineteenth century, some 350 male Alabamas and Coushattas, and their families, including virtually all of the Alabamas and a considerable number of Coushattas, had migrated into Texas and had created extensive settlements in the claim area, along the lower Sabine River, along the Trinity River (as far north on the Trinity as Salcedo and as far south as Atascosito), near the San Jacinto River, on the Neches River, between the Neches and the Trinity Rivers, on the Attoyac Bayou, and along the Opelousas Road. It is reasonable to infer that the total number of Alabamas and Coushattas in the area at the end of the decade was

several times 350 (the Texas Tribe's experts estimated that the total number was about 1,700 persons, or roughly five times the male population).

The evidence shows that, by the end of the first decade of the nineteenth century, the Alabamas and Coushattas were making an extensive use of the resources within the claim area. The Alabamas and Coushattas provided for themselves by farming and hunting. In their farming operations, they raised corn, squash, and potatoes in the vicinity of their wooden cabins. In addition, the record shows that they had good stocks of cattle and horses, thus implying that these animals were raised by the Indians. In the fall and winter, the Alabamas and Coushattas would go on hunting expeditions throughout the claim area to get meat, and also animal pelts to trade at trading posts located at Nacogdoches, in the northern part of the claim area, and at Natchitoches, across the Texas-Louisiana border in the present State of Louisiana. The Alabamas and Coushattas built trails in order to travel through the claim area. They also used the rivers in the claim area as a means of travel.

At the time when the Alabamas and Coushattas began their movement into the claim area, there were no non-Indian settlements in the area, with the exception of a Spanish military garrison and trading post in what is now Nacogdoches County. There were in the area, however, three groups of Indians who were indigenous to Texas. Not surprisingly—as the present-day descendants of the indigenous tribes are not claimants in this case and were not represented in these proceedings—the evidence in the record concerning the activities of those tribes in the claim area is not as extensive as might be desired. The indigenous Texas tribes were as follows:

(a) The tribes of the Hasinai Confederacy were located in the northern part of the claim area. The Hasinai Indians were a branch of the Caddos. As of 1809, the Hasinai population included 60 men with families. An expert witness for the Texas Tribe testified that the Hasinai exercised an influence over the part of the claim area

that now includes the Texas counties of Nacogdoches, Sabine, and San Augustine, from which it is inferred that the Hasinai used the resources of that part of the claim area. The Indians comprising the Hasinai Confederacy remained in the region until the 1850's.

(b) The Bedais Indians lived in the western portion of the claim area. As of 1804, it was estimated that the Bedais population numbered 300 persons. The Texas Tribe's expert witness previously mentioned testified that the Bedais exercised an influence over the part of the claim area which now includes the Texas counties of Walker and Montgomery. Also, there is evidence in the record that the Bedais cultivated corn and traded furs and animal pelts. The Bedais remained in the claim area until about 1850.

(c) The Orcoquizac Indians lived in, and (according to the Texas Tribe's expert witness previously mentioned) exercised an influence over, the southern part of the claim area, i.e., the region which later became the Texas counties of Chambers and Jefferson, the southeast two-thirds of Orange County, and the lower third of Liberty County. There is also evidence in the record that the Orcoquizacs cultivated corn, that they were hunters and fishermen, and that they traded furs. The Orcoquizacs were closely allied with the Bedais, and spoke a language similar to that of the Bedais. The Orcoquizacs population consisted of 250 people in 1804 and 300 people in 1819. The Orcoquizacs had left the claim area by 1850.

There is no evidence in the record regarding any hostile actions taken by the Alabamas and Coushattas toward the indigenous Texas Indians, either designed to drive the Texas Indians out of the claim area or to prevent them from utilizing the resources of the claim area. Conversely, there is no evidence in the record regarding any hostile actions taken by the indigenous Texas Indians designed to prevent the Alabamas and Coushattas from settling in the claim area or from using the resources of the area. Similarly, there is no evidence in the record indicating that the Alabamas and Coushattas sought or obtained permission from the indigenous Texas tribes to settle in the claim area, or that the Texas tribes sought or obtained permission from the Alabamas and Coushattas to remain in the area and use its resources. It is inferred, therefore, that the indigenous Texas Indians and the Alabamas and Coushattas lived together in peaceful coexistence, and jointly used the resources of the claim area, until all of them were later adversely affected by the influx of non-Indians into the claim area. The evidence does show, however, that the Alabamas and Coushattas fought successfully to prevent hostile intrusions by tribes living outside the claim area, such as the Comanches, Karrankawas, and Osages.

It should also be mentioned that some members of three other Indian tribes, none of which was indigenous to Texas, are known to have lived in the claim area, at least for a time, during the period that is involved in the present litigation. For example, approximately 100 Biloxi Indians moved into the claim area in 1807, and settled on what is now known as Biloxi Creek, a tributary of the Neches River. The Biloxi population later increased to approximately 300 members of the tribe. Sometime between 1830 and 1840, the Biloxis moved their settlement to the lower Sabine River; but, after 1840, they returned to their former village on Biloxi Creek. While present in the claim area, the Biloxis intermarried with the Alabamas and the Coushattas. There are no references in the record to the Biloxi Tribe having been in the claim area after the 1840's.

Also, some Choctaws are known to have been in the claim area in 1805, at which time they were living on the Trinity River. The Choctaws cultivated corn, they hunted, and they had a considerable trade in furs. In 1809, 40 Choctaw men, with their families, were living on the Neches River, below the point where the Neches is joined by the Angelina River. In 1819, the Choctaws were living on the Sabine River, "not very far from the sea." Then, in 1840, the Choctaws were said to be moving north, to the area between the Neches and the Angelina Rivers. The record does not contain any

further reference to Choctaws as being present in the claim area.

In addition, some Pakana Muskogees moved into the claim area in 1834, after having migrated westward from what is now the present State of Alabama. This tribe's population at the time consisted of from 75 to 100 people. The Pakana Muskogees spoke a language similar to that of the Alabamas and the Coushattas; and the Pakana Muskogees were gradually absorbed by the Alabamas and Coushattas.

It appears from the record that the Biloxis, the Choctaws, and the Pakana Muskogees lived peacefully, and used resources of the claim area, along with the Alabamas and Coushattas and the indigenous Texas tribes. There is no evidence in the record indicating that the Biloxis, the Choctaws, or the Pakana Muskogees sought or obtained permission from the Alabamas and Coushattas to move into and use resources of the claim area.

Texas—including, of course, the claim area—remained under Spanish control until 1821. The evidence in the record indicates that, as of the time when Spanish sovereignty over Texas ended, the Alabamas and Coushattas were living in the claim area in peaceful coexistence with other Indian tribes previously mentioned as living within the area; and there had been no movement of non-Indian settlers into the claim area. Spain, however, did not at any time grant to the Alabamas and Coushattas, or to other Indian tribes, rights of ownership, or recognize that the Indians enjoyed such rights, in lands within the claim area.

In 1821, Mexico gained its independence from Spain. Consequently, Texas came under the control of the new Mexican Government. The former provinces of the Spanish colony of Mexico became Mexican states. One of these states was the State of Coahuila and Texas, formed by combining the former province of Coahuila and the former province of Texas. The Government of Mexico permitted its states to pass their own colonization laws; and in 1825 the State of Coahuila and Texas passed a liberal colonization law in order to encourage white settlers to move to Texas. As a

result of this law, many white settlers moved into Texas, including the claim area. This law permitted each non-Indian immigrant to receive one square league of grazing land and a smaller amount of farming land. The Mexican Government made land grants to the white settlers, but it refused to issue such grants to the Alabamas and Coushattas, despite the Indians' repeated requests that it do so. Texas and the claim area remained under Mexican control until 1836. By that time, much of the claim area, except for the Big Thicket, was occupied by white settlers.

Texas gained its independence from Mexico in 1836; and the claim area then came under the control of the Republic of Texas. The Republic of Texas instituted a liberal land policy for citizens of the Republic (which excluded Indians). The extent to which settlers took advantage of this is shown by the number of land grants issued by the Republic of Texas. For example, the Republic issued 552 land grants covering lands in what is now Liberty County, and 310 land grants in what are now the Texas counties of Angelina, Nacogdoches, Sabine, San Augustine, and Trinity. Each land grant covered approximately 3,500 acres. The continued movement of white settlers into the claim area disturbed the normal lifestyle of the Indian tribes. In fact, by 1840, white settlers were claiming the Indians' village sites, and forcing the Indians to move elsewhere.

In response to the adverse effect which white settlements were having on the Indians in the claim area, the Republic of Texas determined in 1840 to grant two leagues of land to the Alabamas and two leagues of land to the Coushattas for permanent reservations. The proposed Alabama land grant included within it the site of an established Alabama village. However, when surveyors came to prepare a survey for the Alabama land grant, the Alabamas thought the grant was for white settlers. Consequently, the Alabamas fled, leaving their village to find another homesite. As a result, this grant never became effective. The Coushattas' land grant also did not become effective, because white settlers

had already claimed the designated lands and refused to relinquish them.

As stated previously in the report, Texas entered the Union as a State on December 29, 1845. Thus, Texas, including the claim area, came under the federal control of the United States for the first time. As of December 29, 1845, the non-Indian population of the claim area was many times the number of Alabamas and Coushattas in the area,[3] and the influx of non-Indian settlers had deprived the Alabamas and Coushattas of such control as they had formerly exercised over the area.

One of the unusual features of the conditions under which the Republic of Texas was annexed by the United States was that the State of Texas retained the ownership of all public lands located within its boundaries. In 1853, the Alabama Indians petitioned the State of Texas to provide the Alabamas with a land grant because of the severity of the displacement which they had experienced. The State of Texas responded in 1854 by giving the Alabamas a reservation of 1,110.7 acres, which constitutes part of the Texas Tribe's reservation at the present time. Encouraged by the Alabamas' success, the Coushatta Indians also petitioned the State of Texas for a land grant. In 1856, the Texas Legislature passed an act declaring that 640 acres should be set aside for the Coushattas, but no specific area of land was ever designated pursuant to this statute. As a result, the Coushattas were left wandering about without land. In 1859, however, with the permission of the Alabamas, most of the Coushattas moved onto the Alabama reservation.

In 1928, after persistent lobbying by persons friendly to the Texas Tribe, the Federal Government purchased for the Tribe an additional 3,071 acres adjoining the original Alabama reservation, and deeded the purchased land to the Texas Tribe.

The United States terminated its trust relationship with the Texas Tribe by statute, effective August 23, 1954 (*see* 25 U.S.C. §§ 721–28 (1982)). In House Resolution 69, however, the House of Representatives gave the Texas Tribe the opportunity to establish the validity of its claim against the United States in court.

### Discussion

As stated previously in the report, the Texas Tribe asserts in its complaint that, as of the time when Texas entered the Union, the ancestors of the present members of the tribe held aboriginal title to the lands within the claim area, and that the United States, after it gained federal sovereignty over Texas and the claim area, failed to protect the tribal ancestors in the possession of their aboriginal lands.

Court precedents establish that a successful claim of aboriginal (or Indian) title to an area of land "must rest on actual, exclusive and continuous use and occupancy for a long time prior to the loss of the property." *The Lummi Tribe of Indians v. United States*, 181 Ct.Cl. 753, 759 (1967); *see The Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, 177 Ct.Cl. 184, 194 (1967); *Six Nations, Etc. v. United States*, 173 Ct.Cl. 899, 910 (1965); F. Cohen, *Handbook of Federal Indian Law*, 492 (1982 ed.).

In this connection, decisions have emphasized the factor of *exclusive* use and occupancy by a particular Indian group of the area under consideration. For example, the Supreme Court indicated in *United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941), that a claim of aboriginal (or Indian) title to lands would be defeated by proof that such lands had been "wandered over by many tribes"; *also see Six Nations, Etc. v. United States*, 173 Ct.Cl. 899, 911 (1965); *Duwamish Et Al. Indians v. United States*, 79 Ct.Cl. 530, 604 (1934), *cert. denied*, 295 U.S. 755, 55 S.Ct. 913, 79 L.Ed. 1698 (1935).

In the present case, it is at least questionable whether the Alabamas and Cous-

---

**3.** The 1850 federal census revealed that the non-Indian population of the claim area was somewhat in excess of 30,000. At that time, the Alabamas and Coushattas in the claim area numbered about 1,000.

hattas ever acquired the *exclusive* use and occupancy of the claim area. In this connection, it may appropriately be noted that the claim area was not the ancestral home of the Alabamas and Coushattas. *See United States v. Santa Fe Pacific R. Co.,* 314 U.S. at 345, 62 S.Ct. at 251. Instead, the Alabamas and Coushattas were immigrant groups that first began to appear in the claim area around the year 1800. At that time, there were indigenous Texas tribes, the Hasinai, the Bedais, and the Orcoquizacs, that were already living in the claim area, and utilizing the resources of at least substantial portions of the claim area for their farming and hunting activities. Then, during the first decade of the nineteenth century, while the Alabamas and Coushattas were still in the process of moving into the claim area, other immigrant groups of Indians, Biloxis and Choctaws, also moved into the claim area and thereafter lived in the general vicinity of Alabamas and Coushattas.[4]

Without seeking or obtaining permission from the Alabamas and Coushattas, the various indigenous and immigrant groups of Indians mentioned in the preceding paragraph continued to live in, and to utilize resources of, the claim area, along with the Alabamas and Coushattas, until they were all severely affected by the influx of white settlers into the claim area.

■ For the purposes of this report to the House of Representatives, however, it is not necessary to reach a firm determination as to whether the Alabamas and Coushattas ever acquired *exclusive* use and occupancy of the claim area, or of any portion of the area. Even if the evidence in the record clearly showed that the Alabamas and Coushattas did acquire for a time exclusive use and occupancy of, and thus aboriginal title to, the entire claim area, it would be necessary to report to the House of Representatives that the Alabamas and Coushattas did not have exclusive use and

occupancy of the claim area at the critical time that is involved in their claim.

It has been mentioned previously that all the Indian groups in the claim area were severely affected by the influx of white settlers into the claim area. That influx occurred with the encouragement of the Mexican Government, particularly the Mexican State of Coahuila and Texas, and, later, with the encouragement of the Republic of Texas. By December 29, 1845, when Texas entered the Union as a State, and the United States Government acquired federal sovereignty over Texas and the claim area for the first time, white settlers had moved into and settled in the claim area in such numbers that they had displaced the Alabamas and Coushattas to such an extent that the Alabamas and Coushattas no longer had (if they ever had) *exclusive* use and occupancy of lands within the claim area.

The United States, of course, was not responsible for any actions, or failures to act, on the part of the Governments of Mexico (including its State of Coahuila and Texas) and the Republic of Texas which interfered with such rights as the Alabamas and Coushattas may have had in lands within the claim area. It is proper to note in this connection that there is no evidence in the record indicating that the United States cooperated in any way with the Governments of Mexico and the Republic of Texas with respect to these matters. As our predecessor, the United States Court of Claims, stated in *Six Nations, Etc. v. United States,* 173 Ct.Cl. at 908:

> * * * If the United States is to be charged with dealings for which someone else appears on the surface to be responsible, there must be a showing of true concert, partnership, or control on the part of the Federal Government. * * *

■ Thus, it was not the United States, but the Governments of Mexico and of the Republic of Texas, that failed to protect the Alabamas and Coushattas in such rights as

---

4. The Pakana Muskogees, mentioned in the findings of fact as moving into the claim area,

did not arrive there until about 1834.

they may have had in the lands of the claim area.

*Conclusions*

The Hearing Officer, on the basis of the evidence in the record, states the following conclusions:

(a) At the time when Texas entered the Union as a State, and the United States first gained federal sovereignty over Texas and the claim area, the Alabamas and Coushattas did not have the exclusive use and occupancy of lands within the claim area; and, therefore, they did not have aboriginal (or Indian) title to such lands.

(b) If the Alabamas and Coushattas ever had the exclusive use and occupancy of lands within the claim area, they had lost such exclusive use and occupancy due to the influx of white settlers before Texas entered the Union and the United States acquired federal sovereignty over Texas and the claim area.

(c) The influx of white settlers into the claim area, mentioned in conclusion (b), was encouraged by the Government of Mexico, particularly the Mexican State of Coahuila and Texas, and, later, by the Republic of Texas.

(d) There is no evidence in the record that the United States cooperated in any way with the Governments of Mexico and of the Republic of Texas with respect to the influx of white settlers into the claim area; and, therefore, the United States does not bear any responsibility for the influx of white settlers into the claim area that resulted in the loss by the Alabamas and Coushattas of such rights as they may previously have had in lands within the claim area.

(e) The Alabama Coushatta Tribe of Texas does not have a legal or equitable claim against the United States arising from the loss of such rights as they may once have had in lands within the claim area.

(f) Any award by the United States to the Alabama Coushatta Tribe of Texas pursuant to H.R.Res. 69, 98th Cong., 1st Sess. (1983), would be a gratuity.